[No. 13924-3-II.  Division Two.  December 17, 1992.]

ROBERT ALLEN, ET AL, *Respondents*, v. THURSTON COUNTY
FIRE PROTECTION DISTRICT NO. 9,
ET AL, *Appellants*.

2

*Clark B. Snure,* for appellants.

*Wayne L. Williams* and *Rolland, O'Malley & Williams, P.S.,* for respondents.

MORGAN, J. — The Thurston County Fire Protection District No. 9 (the District) appeals a summary judgment awarding Robert Allen, the District's former fire chief, $18,813.80 for unused sick leave, interest, attorney's fees and costs. We affirm.

For the most part, the facts are uncontroverted. To the extent that is not the case, we take the evidence in the light most favorable to the District. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

By written contract of employment dated November 10, 1983, the District hired Allen as its fire chief. He was to be a nonunion employee and, automatically, a member of the Law Enforcement Officers' and Fire Fighters' Retirement System Plan I (LEOFF I).[1]

Allen's written contract of employment was silent about sick leave. However, the District granted nonunion employees

---

[1] In its brief on appeal, the District expressly states that Allen was a member of LEOFF I. Allen does not question or refute that statement. Thus, we accept it, even though the record does not show why Allen was a member of LEOFF I. In passing, we note that LEOFF I covers only those persons who first became members of the LEOFF System prior to October 1, 1977. RCW 41.26.030(28).

the same sick leave as union employees,[2] and its union employees were contractually entitled to sick leave by virtue of a collective bargaining agreement.

Allen initially received 8 hours of sick leave per month. Later, he received 16 hours per month, then 24 hours per month. He was allowed to accrue unused sick leave from month to month.

The District's administrative secretary, Beverly Austin-Russell, was responsible for calculating accrued sick leave and subtracting used sick leave. When Allen needed to use sick leave, he informed her, and she entered the necessary information in the records.

On December 6, 1985, Allen suffered a heart attack while at work. He was never able to return to work.

For 6 months following December 6, 1985, the District made monthly payments to Allen in an amount equaling 100 percent of his salary. It is obvious that some of those payments were initially made as sick leave allowance; the District commenced making them *before* Allen had been found disabled by the local disability board, and it contemporaneously deducted a corresponding amount of sick leave hours from the sick leave that Allen had previously accrued.

Apparently during the spring of 1986, Allen applied for a disability retirement allowance, and his application was granted by the local disability board.[3] *See* RCW 41.26.030-(18). We cannot tell from the record whether his application was based on RCW 41.26.120 or RCW 41.26.125, but the two statutes are essentially the same for purposes of this case. Former RCW 41.26.120 provided:

> Any member . . . may be retired by the disability board . . . for any disability incurred in the line of duty which has been continuous since his discontinuance of service and which renders him unable to continue his service. No disability retire-

---

[2]The only nonunion employees of the District were Allen and the administrative secretary, Beverly Austin-Russell.

[3]The record does not show the exact date on which Allen applied or the exact date on which the local board decided to grant his application.

ment allowance shall be paid until the expiration of a period of six months after the discontinuance of service during which period the member, if found to be physically or mentally unfit for duty by the disability board following receipt of his application for disability retirement, shall be granted a disability leave by the disability board and shall receive an allowance equal to his full monthly salary and shall continue to receive all other benefits provided to active employees from his employer for such period. . . .

(1) Any member who believes he is . . . disabled shall be examined by such medical authority as the disability board shall employ, upon application of said member . . . stating that said member is disabled . . ..

(2) If the examination shows, to the satisfaction of the disability board, that the member is . . . disabled from the further performance of duty, that such disability was incurred in the line of duty, and that such disability has been continuous from the discontinuance of service, the disability board shall enter its written decision and order, accompanied by appropriate findings of fact and by conclusions evidencing compliance with this chapter as now or hereafter amended, granting the member a disability retirement allowance; . . .[.]

RCW 41.26.125 contained corresponding provisions for disabilities not incurred in the line of duty.

When the local disability board found that Allen was disabled, it backdated the statutory 6-month period for disability leave to the date of his heart attack, December 6, 1985. The District asserts that this was in accord with the local board's routine practice. Without citing supportive authority, it says that "disability leave, when granted, is normally retroactive to the date the disability occurred."

After the local board's decision, the District altered its paper work to relabel as disability leave allowance those payments that it had previously made to Allen as sick leave allowance. It was possible for the District to do this because sick leave allowance and disability leave allowance called for payments in the same amount: 100 percent of Allen's salary. The District also "reinstated" on its books the sick leave hours that it had deducted since Allen's heart attack. These actions were taken without Allen's consent, and they enabled the District to treat him as not having used sick leave after his heart attack.[4]

---

[4] In an attachment to one of the affidavits, Beverly Austin-Russell said, in part: "He was on sick leave until he was granted disability leave by the retire-

Because the District was treating Allen as having been on disability leave from December 6, 1985, the State started paying a disability retirement allowance on June 6, 1986. As of that date, the District's records showed that Allen had 552 hours of unused sick leave.

In June 1986, Allen attended two meetings of the District's board of fire commissioners and asked to be paid for one-quarter of his sick leave. The commissioners denied his request. In November, he sent a letter demanding payment, but again the District refused.

In May 1987, Allen sued the District to recover sick leave, costs, attorney's fees, and interest. The parties brought cross motions for summary judgment, and in November 1989, the trial court granted Allen's motion. According to the District, the trial court "reasoned that since the Plaintiff was on District sick leave, the retroactive granting of disability leave by the Thurston County LEOFF Disability Board did not remove him from the District's sick leave and, therefore, he had the right to remain on sick leave until it was fully used and then to be placed on disability leave." The trial court awarded judgment for $18,813.80, representing $10,163.86 in sick leave benefits, plus associated interest, fees and costs.[5] The District now appeals.

On appeal, neither party disputes the basic nature of the LEOFF I statutory scheme. A local disability board deter-

---

ment department, and I told him that when he was granted the disability leave, his sick leave would be reinstated and he would be on disability leave, and that's what I was told by the department of retirement."

In his affidavit, Allen said, in part:

"2. That I continued to be on sick leave until I was granted disability leave.

"3. That I asked the secretary for the Thurston County Fire Protection District whether I could continue using my sick leave. She informed me that, when I was granted disability leave, it would be back-dated to the first day of my illness, and my sick leave would be restored, and, therefore, it would be pointless to use my sick leave."

[5]The amount of the judgment is broken down as follows:

| | |
|---|---|
| Unused sick leave: | $10,163.86 |
| Pre- and postjudgment interest: | 4,668.34 |
| Attorney's fees: | 3,780.00 |
| Costs: | 201.60 |
| | $18,813.80 |

mines whether an employee is disabled. RCW 41.26.120(2); RCW 41.26.125(2). After a finding of disability, the employer must pay a disability leave allowance for 6 months at 100 percent of the employee's monthly salary. RCW 41.26.120; RCW 41.26.125. When disability leave expires, the State must pay, for the duration of the disability, a disability retirement allowance of between 50 and 60 percent of the employee's final average salary. RCW 41.26.130(1), (2).

The problem is how to correlate statutory LEOFF I benefits with contractual sick leave benefits. We start by examining three cases.

*Longview v. Public Employees' Retirement Bd.*, 97 Wn.2d 521, 646 P.2d 768 (1982) involved a firefighter who had accrued contractual sick leave benefits and who actively demanded both those benefits and his statutory LEOFF I rights. "The trial court accepted the City's argument that the 6-month disability allowance commenced on the date the fire fighter became disabled, without regard to his sick leave benefits." 97 Wn.2d at 523. In practical effect, this divested the firefighter of the accrued sick leave benefits to which he was contractually entitled. The Supreme Court reversed, saying:

> We begin our analysis of this issue by determining when the 6-month disability leave period provided by RCW 41.26.120 begins. . . . The statute does not . . . state that the disability leave period must begin immediately after the disability is incurred. So long as the disability leave begins after, rather than before, the member is disabled, the statute is satisfied. In other words, the statute does not specify at what point after the disability is incurred . . . the disability leave shall begin.
>
> It is therefore necessary for this court to . . . determine the time at which the disability leave begins. . . . The intent of the Legislature in RCW 41.26.120 appears to be that a member of the LEOFF retirement system is entitled to disability leave at full salary for 6 months immediately before beginning disability retirement. Nowhere in the statute is there any suggestion of an intent to interfere with rights to sick leave that a member might have by virtue of a contract with his employer. We would be reluctant to find that such contractual rights were impaired by implication. *See* 3 C. Sands, *Statutory Construction* § 61.06 (4th ed. 1973). Therefore, we interpret the statute so as to give effect to the 6-month disability leave, together

with any sick leave to which the member is entitled under his contract of employment.[6]

(Citation omitted.) 97 Wn.2d at 525-26; *see also Cannon v. Moses Lk.*, 35 Wn. App. 120, 663 P.2d 865, *review denied*, 100 Wn.2d 1010 (1983).

*Loun v. Bremerton*, 46 Wn. App. 849, 732 P.2d 1034, *review denied*, 108 Wn.2d 1020 (1987) involved a police officer who had accrued contractual sick leave benefits, but whose employment contract provided that benefits not used would be lost upon separation from employment. The officer applied for disability retirement and "would have been entitled to use all of his accumulated sick leave before the disability leave began had he so requested." 46 Wn. App. at 850. However, he did not so request, and the local disability board ruled that his statutory LEOFF I benefits would be made retroactive to the date of his application therefor.[7] The effect was to divest the officer of his unused sick leave benefits, but the Court of Appeals nevertheless affirmed. It ruled that the officer "was required to request the accumulated leave or lose it", 46 Wn. App. at 851, and that he lost it by not requesting to use it. 46 Wn. App. at 851.

*Moran v. Stowell*, 45 Wn. App. 70, 724 P.2d 396, *review denied*, 107 Wn.2d 1014 (1986) involved a number of police officers who, "under *Longview* . . . were entitled to use their accumulated sick leave before going on the disability leave

---

[6]RCW 41.26.120 was amended between the time of the events in *Longview* and the time of the events in the instant case, but its meaning was not altered for purposes of the instant case. In 97 Wn.2d at 527, the *Longview* court said:

Finally, since the Superior Court's determination in this case, the Legislature has amended RCW 41.26.120. The somewhat obscure phrase "disability is incurred" has been replaced by the phrase "discontinuance of service". . . . This appears to be sufficiently broad to include periods of sick leave . . .. Under the amendment, therefore, disability leave would not begin until accrued sick leave was expended.

[7]Parenthetically, we note that *Loun* contravenes the assertion made in this case that " 'disability leave, when granted, is normally retroactive to the date the disability occurred.' " In *Loun*, the local disability board made disability leave retroactive not to the date on which the disability occurred, but rather to the date on which the employee applied for LEOFF I benefits.

that precedes disability retirement." 45 Wn. App. at 79; *see also* 45 Wn. App. at 80. However, all but one of the officers "went on disability leave without having used all of their accrued sick leave". 45 Wn. App. at 79. As in *Loun*, then, the officers lost the accrued leave because they had made no request to use it.

■ *Longview*, *Loun*, and *Moran* disclose that two factors determine a LEOFF I employee's right to use sick leave before his or her LEOFF I benefits take effect. One, of course, is whether the employee has accrued sick leave benefits by virtue of his or her contract of employment. The other is whether the employee requests to use such benefits before his or her LEOFF I benefits commence. If both of these factors are satisfied, the employee is entitled to use his sick leave before his disability leave starts, assuming that his or her employment contract does not contain a specific provision to the contrary.

The first factor is satisfied here. Allen accrued and used sick leave throughout his employment, and as late as June 1986, the District's books showed that if he had remained employed, he would have been entitled to 552 hours of sick leave.[8]

---

[8]Allen's right to sick leave benefits was not disputed in the trial court. Although some proceedings in the trial court were not recorded, the court stated in its letter opinion dated November 22, 1989:

The analysis . . . begins with whether the plaintiff had sick leave benefits which he was allowed to accrue? The agreed answer is yes.

Moreover, the trial court stated in recorded oral remarks made on April 9, 1990, in the presence of both counsel and without objection, that (1) "the parties and the Court have agreed that the factual record before this court establishes that Mr. Allen . . . was allowed to accumulate sick leave during his tenure" with the District; (2) that "all parties agree that Mr. Allen . . . was entitled to sick leave benefits"; and (3) that

the court finds from undisputed facts that Mr. Allen was entitled to sick leave benefits. The district has conceded that issue.

Nevertheless, the District now contends in this court that it is a municipal corporation; that such corporations are not subject to implied contracts in the same way as other entities; and that Allen had no contractual right to sick leave benefits. As support, it cites *State ex rel. Bain v. Clallam Cy. Bd. of Cy. Comm'rs*,

The second factor is also satisfied here. Both Allen and Austin-Russell testified that he asked to be on sick leave.[9] Moreover, it is clear that he was actually on sick leave until the local board made his disability leave retroactive and the District "reinstated" his sick leave on its books.[10]

Two tentative conclusions can be drawn at this point. One is that under *Longview*, Allen had the right to use his contractual sick leave benefits before his statutory LEOFF I benefits started. The other, closely related to the first, is that neither the District nor the local disability board had the right to backdate the commencement of his LEOFF I benefits in such a way as to strip him of the sick leave benefits that he had asked to use and that he was in the process of receiving.

The reason these conclusions are tentative is that they assume Allen's contractual right to sick leave was not qualified by a specific contract provision describing how his sick leave benefits were to correlate with his LEOFF I benefits. Urging that there was such a provision, the District points to article 14, section 5 of the collective bargaining agreement between the District and its union employees. Article 14, section 5 states in pertinent part: "Sick leave benefits for

---

77 Wn.2d 542, 463 P.2d 617 (1970) and *Stoddard v. King Cy.*, 22 Wn.2d 868, 885, 158 P.2d 78 (1945).

We decline to consider this contention because it was not made below — and indeed, because it is directly contradictory of what occurred below. Additionally, the cited cases are distinguishable. In each, the existence of the claimed benefit was disputed, whereas here it is virtually undisputed that Allen was allowed to accrue and use sick leave throughout his employment. Moreover, in each cited case it would appear that the circumstances were not such as to warrant a reasonable implication of liability, even assuming that municipal corporations are subject to implied contracts in the same way as other persons and entities.

[9]Allen's request to use sick leave is to be distinguished from a request to be paid cash for unused sick leave. We are not concerned with the latter type of request.

[10]The District asserts that only its elected board of directors could entertain and grant Allen's request to use sick leave. Nothing in the law or the record supports that assertion.

uniformed employees covered under the Law Enforcement Officer's [*sic*] and Firefighters [*sic*] Act (Chapter 41.26 RCW) shall run concurrently with the disability period."

By its terms, article 14, section 5 applies when sick leave and LEOFF I disability leave are running at the same time. Thus, it has obvious application to cases such as *Loun v. Bremerton, supra,* in which an employee opts to receive LEOFF I benefits before his sick leave has been exhausted. In such cases, article 14, section 5 insures that the District will not be required to pay more than 100 percent of the employee's salary in any given month.

Article 14, section 5 says nothing that would authorize the District to accelerate the running of the LEOFF I disability period in a way not otherwise provided for by law. Nor does it say anything that would excuse the District from paying sick leave benefits otherwise due for a period of time during which LEOFF I disability leave is not running.[11] In this case, it did not authorize the District or the local disability board to backdate the commencement of Allen's LEOFF I benefits, nor did it excuse the District from paying sick leave coming due after Allen's heart attack but before his LEOFF I benefits properly started.

■ Concluding the matter of the District's liability, we hold that the tentative conclusions we drew above are indeed correct. Under *Longview,* Allen had the right to use his contractual sick leave benefits before his statutory LEOFF I benefits started, and neither the District nor the local disability board had the right to unilaterally backdate his LEOFF I benefits in such a way as to strip him of his sick leave benefits. Properly characterized, the payments he received from the District after his heart attack but before his sick leave was exhausted were in the nature of sick leave allowance. Properly characterized, the payments he received from the

---

[11]In making this statement, we do not mean to imply that a differently worded provision would not be enforceable. We have no occasion to consider a provision stating that sick leave will not be paid, or if paid shall be reimbursed, for periods of time after a LEOFF I disability is incurred and during which the disability is continuing.

District after sick leave was exhausted but before June 6, 1986, were in the nature of disability leave allowance. On June 6, the District stopped paying disability leave allowance prematurely — in other words, before it had paid the entire 6-month allowance mandated by RCW 41.26.120 and .125. As a consequence, the District remains liable for that portion of the 6-month disability leave allowance that it has not yet paid.

The amount of the District's liability is not before us. The parties have stipulated that if the District owed Allen more money, the amount was $10,163.86 plus interest, fees and costs.[12]

Allen claims reasonable attorney's fees on appeal. He relies on MAR 7.3, which provides in part:

> The court shall assess costs and reasonable attorney fees against a party who appeals the award and fails to improve the party's position on the trial de novo. . . .

The record contains two vague references to arbitration, but it does not show the amount of the arbitration award. Thus, assuming without holding that MAR 7.3 can apply in such a way as to mandate reasonable attorney's fees incurred in the Court of Appeals, we have no way of determining whether its provisions have been satisfied in this case.

Affirmed.

PETRICH, C.J., and WORSWICK, J. Pro Tem., concur.

---

[12]Nothing said herein is intended to affect the State's right, if any, to recover from Allen in the event that he recovers from the District the entire unpaid portion of his 6-month disability leave allowance. The period of time relevant to the amount that Allen is entitled to recover started on June 6, 1986, and ended on that date which followed by 6 months the date on which Allen's sick leave benefits were exhausted. During that period, the District should have paid, but did not pay, disability leave allowance equal to 100 percent of his salary. During the same period, it appears that the State paid disability retirement allowance equal to a smaller percentage of Allen's salary. It is clear from RCW 41.26.120 and .125 that Allen was not to receive disability leave allowance and disability retirement allowance at the same time. Thus, when he is paid the remainder of his disability leave allowance by the District, he may have an obligation to reimburse the State for disability retirement allowance paid during the same period.